## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

MARKUS HARVELL,          )
                                 )
     Petitioner,        )
                                 )
     v.                   )       Case No. 13-cv-03346
                                 )
WALTER NICHOLSON,[1] Warden,  )
Stateville Correctional Center,   )
                                 )
     Respondent.      )

## <u>OPINION</u>

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

Now before the Court is Petitioner Markus Harvell's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (d/e 2) (Petition). For the reasons set forth below, Harvell's Petition is DENIED.

---

[1] Walter Nicholson is the current warden of Stateville Correctional Center, the Illinois Department of Corrections facility in which Harvell is serving his state sentence. Therefore, the Court has substituted Mr. Nicholson as Respondent in this case. <u>See</u> Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts; <u>Bridges v. Chambers</u>, 425 F.3d 1048, 1049 (7th Cir. 2005).

# I. **BACKGROUND**

On August 9, 2001, Harvell and three of his cousins, Andre "Cat Daddy" Jones, Nick Gates, and Angie Caldwell drove in a black Pontiac Grand Am to Brandon Court housing complex in Springfield, Illinois. Harvell, Cat Daddy, Gates, and Caldwell stood among a group of people when Edwin Jones, a black male wearing a wig, glasses, and a white glove (frequently referred to as "Wig-man"), appeared. Exhibits Accompanying Answer to Habeas Corpus Petition (d/e 8) (Exh.), Exh. AA at 55, 182, 183-85; Exh. BB at 151; Exh. CC at 113-118. Due to Wig-man's appearance, Harvell and the others started laughing at Wig-man, when Harvell found himself in a "little argument" with Wig-man. Exh. AA at 183-84; Exh. BB at 16-17, 122. As Wig-man proceeded to draw his gun, people began to scatter and Wig-man began shooting at Harvell and his associates. Exh. AA at 185; Exh. BB at 18. At some point, Harvell starting shooting his own gun. During the shooting, a 13-year-old boy was shot. The boy was shot while running from the melee with his cousin John Williams. Exh. BB at 180-81. The boy was taken to Memorial Medical Hospital and was pronounced dead shortly thereafter. Exh. BB at 30, 60.

Harvell was charged with first-degree murder. His jury trial began on February 5, 2002, before the Circuit Court for Sangamon County, Illinois (trial court). During opening statements, Assistant State's Attorney John Madonia described the events leading up to the shooting. Madonia said Harvell retrieved, "his own weapon and go[ing] in search of that man who had fired at him," Harvell, "stalks through Brandon Court with his gun, sees some people and opens fire, killing that young boy." Madonia concluded, "That is what happened. That is some of the evidence you will hear the basic gist of this story, how the Defendant was involved and why he was involved." Exh. AA at 12-13.

John Williams, the victim's cousin, testified that when Wigman pointed a gun at Harvell, Williams and the victim ran. They both stopped so Williams could tie his shoes. Exh. BB at 122-23. At that point, Harvell, from across the road with a gun in his hand, yelled, "Who's that," at Williams and the victim. Exh. BB at 123-26. After Harvell yelled, "Who's that," both Williams and the victim started to run and "three seconds" later, Williams stated he heard gunshots. Exh. BB at 123-24, 141. Williams testified that the victim was shot at that time. Exh. BB at 125. Williams identified Harvell

as the person across the road with the gun. Exh. BB at 125, 159. On cross-examination, Williams testified that less than 10 or 15 seconds passed between the time Wig-man first shot and the time the victim was shot.  Exh. BB at 159-65.

A bystander who knew of the victim, Byron Walker, testified that while he was sitting in the parking lot, he saw Harvell and two others get out of a Pontiac Grand Am and walk towards the housing complex. Exh. BB at 95. At some point while Walker was walking to the pay phone, he heard "three or four, five at most" shots go off. Exh. BB at 84-85. After hearing the gunfire, Walker ran to an apartment.  After a "couple of minutes," Walker left to walk back to the pay phone when he saw John Williams and the victim run by. Exh. BB at 97-98. About a minute into making his phone call, he heard more gunfire, and dropped the phone. Exh. BB at 85, 101. He saw Harvell around the corner holding a gun. Exh. BB at 85, 101. Walker and Harvell looked at each other for "about thirty seconds" when Harvell said, "don't run," at which point Walker ran. Exh. BB at 87. Walker stopped in front of security cameras and turned around "face to face" with Harvell. Exh. BB at 89-90.

Andre "Cat Daddy" Jones testified that Harvell gave Cat Daddy the key to the black Pontiac Grand Am, and he drove both Harvell and Gates to Brandon Court. Exh. 17-18. Cat Daddy stated that as soon as Wig-man pulled a gun out of his pocket, he ran and heard "maybe four or five, maybe more" gunshots. Exh. BB at 18, 19. Cat Daddy ran into a wall, and afterwards momentarily ran with Williams and the victim. Exh. AA at 160. When Cat Daddy eventually made it back to the Pontiac Grand Am, he saw Harvell walking up to the car. Exh. BB at 19, 50.

Nick Gates testified that as soon as Wig-man started shooting at Harvell, Gates also ran. Exh. AA at 185. Gates guessed the second set of gun shots occurred "two, three minutes" after the first set of shots by Wig-man. Exh. AA at 184, 186. After running "for a bit," at which point there were no more shots fired, Gates stated he made his way back to the Pontiac Grand Am. Exh. AA at 185. While walking up to the car, Gates saw Cat Daddy already standing by the car, and Harvell walking up to the car with a gun in his hand. Exh. AA at 186-87. Gates also testified that he noticed Harvell with a gun during the incident for the first time at that moment. Exh. AA at 187.

A bystander, Terry Hollingsworth, testified that as she walked across a church parking lot, she saw "people running and shooting." Exh. CC at 129. Hollingsworth saw someone who was shot fall in front of the day care center door across the street and a person wearing a hat, wig, and sunglasses run by the victim. Exh. CC at 128, 130-31. Hollingsworth did not see anything in the hands of the person wearing a hat, wig, and sunglasses. She said the person wearing a hat, wig, and sunglasses seemed as if he was running away from "whoever was shooting out of Brandon." Exh. CC at 131.

Angie Caldwell, Harvell's cousin, testified she was in the car with Harvell, Cat Daddy, and Gates when they drove to Brandon Court. Exh. CC at 111-12. Caldwell remembered that Harvell and Wig-man got into an argument, and then Wig-man pulled out a gun and started shooting at Harvell. Exh CC at 116-17. She stated that once Wig-man started shooting, Caldwell ran inside a building while Harvell ran away from Wig-man in another direction. Exh. CC at 117-18.

The evidence showed that the victim was shot with a .22 caliber bullet, Harvell's weapon fired .22 caliber bullets, but Wig-

Man's pistol fired 9 mm bullets.   See Exh. CC at 16; Exh. HH at 11;

Exh. DD at 18 (closing argument reference to evidence regarding

fact the victim was shot with a .22 caliber bullet).

Harvell decided not to take the stand.  The trial court advised

Harvell of his right to testify. Exh. CC at 105-08. Harvell stated in

the affirmative that his decision not to testify was a, "free and

voluntary decision, on [his] part." Exh. CC at 106.

During a jury instruction conference, Harvell's attorney, Jon

Noll, did not request a jury instruction on the lesser-mitigated

offense of second-degree murder:

> The Court:        Okay, all that having been done, Mr.
> Harvell, on the record we discussed prior to the court
> reporter entering the room with the Attorneys present the
> fact that State's Attorney office, the prosecution, did not
> offer a jury instruction on Second Degree Murder. In
> addition, it's clear to the court, and I want to make sure
> it's clear to you that not only did the State's Attorney's
> office not proffer said jury instruction, but neither did your
> counsel. Understand the significance of that?
>
> A [Mr. Harvell]: Yes.
>
> The Court:        Would anybody like for me to admonish?
>
> Mr. Madonia:   I think that's sufficient.
>
> Mr. Noll:        If I tender a Second Degree instruction,
> would you give one?

| | |
|---|---|
| The Court: | Okay, are we finished for the day? |
| Mr. Madonia: | Yes, your Honor. |

Exh. CC at 150.  After all witnesses presented testimony, Madonia asserted in closing arguments that Harvell's action was, "strictly retaliation, all about retaliation, revenge."  Exh. DD at 4.   The jury found Harvell guilty of first-degree murder. Exh. DD at 59.  The trial court then sentenced Harvell to 50 years in prison. Exh. II at C204.

On appeal, the Illinois appellate court for the Fourth District (appellate court) remanded the case because the trial court failed to admonish Harvell adequately that if he wanted to appeal, he had to file the appeal within 30 days of sentencing. Exh. I, at 3; Exh. D, at 15.

On May 27, 2004, the trial court on remand admonished Harvell of his rights.  After informing Harvell of his rights, Harvell complained about Attorney Noll's failure to submit an instruction on second-degree murder. Exh. R at 2, 4; Exh. GG at 4-5. The following discussion ensued:

> Mr. Harvell:     On the, you know, what happened, you know, my lawyer, he was telling me that someday I should raise the issue about being sentenced under Second Degree because it's all – somebody was shooting

at me and I shot back at them at that time but mistakenly hit Andre, the boy, that night.

Mr. Noll:          Judge, could I –

The Court:       You may.

Mr. Noll:          Judge, I believe the appellate Counsel for the Defendant wishes the Court to consider in terms of sentencing that the Defendant acted under strong provocation. Specifically, he was shot at, and that if he did commit this murder it was under that strong provocation. I believe that's the statement you want to have placed in the record?

Mr. Harvell:     Yes.

The Court:       Remind me, counsel, was that a lesser included?

Mr. Noll:   Judge, that got into a bit of conflict between me and my client. I had requested it, but my client did not want to proceed forward with it. That is my recollection.

. . . .

The Court:       Some people make a choice. It's either all or nothing or do the lesser included.

Mr. Harvell:     Judge, that's wrong.

Mr. Noll:          Go ahead and correct me.

Mr. Harvell:     I had asked for a Second Degree Murder instruction. My mom even asked. Now I don't see how he can sit up here and say –

> The Court:　　I'm not – this is not a time to chastise your lawyer, okay?
>
> Mr. Harvell:　　I'm not, but he –
>
> The Court:　　I understand. I get it. It is on the record, okay? . . . .

Exh. R at 4-5; Exh. GG at 4-5.

On September 30, 2004, Harvell filed a notice of appeal. Exh. C at 6. On direct appeal Harvell raised three issues:

> (1) Harvell did not waive his right to tender an instruction on the uncharged lesser offense of second-degree murder;
>
> (2) the trial court failed to comply on remand with the order of the appellate court; and,
>
> (3) Harvell was denied the effective assistance of counsel because Noll failed to file a written motion to reconsider sentence, thereby forfeiting a challenge to Harvell's sentence.

Exh. A at 4; Exh. C at 1.

On July 18, 2005, the appellate court affirmed. Exh. C. The appellate court held that the trial court was not required to admonish Harvell that he had a right to decide whether to request an instruction on second-degree murder and to ascertain on the

record whether Harvell knowingly and voluntarily waived his right to make that request. Exh. C at 6-9. The appellate court further stated that the record did not show whether Harvell wanted to proffer a jury instruction on second-degree murder. Exh. C at 9. Because Harvell had failed to cite relevant authority, the appellate court held that Harvell had failed to show ineffective assistance of counsel and had forfeited that claim on appeal. Exh. C at 13-15.

On December 1, 2005, Harvell filed a Petition for Leave to Appeal (PLA). Exh. D at 1. Harvell raised the following issues in his PLA:

> The issue for review arises from the appellate court's affirmance of Petitioner's conviction for murder where, the issue raised by petitioner on his appeal is whether, once the trial court decided to obtain an on-the-record waiver of the lesser offence instruction, the court had a duty to inform the petitioner that the decision to tender such an instruction belonged to him and not his attorney.

> Did the appellate court error and manifestly abuse its discretion by, ruling the cases cited by Petitioner did not support his argument of, admonishing petitioner of the right to seek an instruction on lesser included offense?

> Did the appellate court error and manifestly abuse its discretion by denying him relief under the claim of ineffective assistance of counselor claim, where counselor fail to perfect Direct Appeal?

Exh. D at 2-3. On December 1, 2005, the Illinois Supreme Court denied Harvell's PLA. Exh. E at 1.

On June 26, 2006, Harvell filed his pro se petition for post-conviction relief in the trial court. Exh. JJ at 1. Harvell's petition alleged that his constitutional rights were violated when:

> (1) he was denied effective assistance of trial counsel where counsel failed to adequately prepare for trial, failing to be at least minimally competent;
>
> (2) his conviction was obtained erroneously because the trial court admitted improper evidence against him;
>
> (3) he was denied due process and equal protection under the law because he was not found guilty beyond a reasonable doubt of first degree murder;
>
> (4) he was denied effective assistance of appellate counsel because counsel failed to present additional issues on appeal.

Exh. JJ at 12.

Harvell submitted his affidavit with the Post-Conviction Petition. Harvell's affidavit stated that he spoke with Noll about

second-degree murder instructions, that after realizing his situation qualified for second-degree murder instructions, Harvell suggested it should be the trial strategy. Exh. JJ, Harvell Aff. at 3. He also stated that he again suggested to Mr. Noll that because of discovery evidence, "we should pursue," second-degree murder instructions. Exh. JJ, Harvell Aff. at 3. When the trial court asked Harvell if he understood the significance of the fact that both parties did not tender a second-degree murder instruction, he answered yes, but even though he said yes, he did not agree with the decision. Exh. JJ, Harvell Aff. at 3.

Harvell also submitted an affidavit from his mother, Elizabeth Harvell (Elizabeth). Elizabeth's affidavit said she received a collect call from Harvell in January 2002 relaying to her that he was concerned about the progress of his case. Exh. JJ Elizabeth Aff. at 1. She believed that after first meeting with Noll, both she and Harvell were under the impression that Harvell would be taking the stand and Noll would be seeking second-degree murder. Exh. JJ, Elizabeth Aff. at 1. She called Noll to discuss Harvell and her concerns. Noll replied he was aware of Harvell's concerns, but Noll already had a trial strategy in place, and it was too late to change

the strategy. Exh. JJ, Elizabeth Aff. at 2. The trial court summarily dismissed Harvell's petition as "frivolous and without merit." Exh. I at 4.

On July 14, 2008, the appellate court reversed and remanded that Post-Conviction Petition for a hearing. Exh. I. The appellate court found Harvell stated the "gist" of a constitutional violation, as "he was not given the opportunity to make the final decision on giving that instruction." Exh. I at 1, 7. The appellate court found evidence regarding who made the final decision to submit second-degree murder instructions contradictory, noting that Defendant's affidavits could support a constitutional violation. Exh. I at 9.

On remand, the trial court appointed counsel for Harvell. Harvell's counsel filed an amended petition for post-conviction relief re-alleging the claims made in the original pro-se petition. See Exh. HH at 4.

On January 19, 2011, the trial court held an evidentiary hearing on the Amended Post-Conviction Petition. Exh. HH. Harvell's counsel stated at the beginning of the hearing, "[R]eally the issue is fairly simple, Your Honor, that being whose decision

was it to proceed forth on an all or nothing First Degree Murder versus acquittal defense." Exh. HH at 5.

Harvell, Elizabeth, and Attorney Noll testified at the hearing. Harvell testified that on or about August 11, 2001, he discussed the facts of the case with Noll. Noll told Harvell the case looked, "like a Second Degree murder case and I [Harvell] would be testifying." Exh. HH at 8. Harvell testified that at first he did not quite understand what a Second Degree Murder charge was, but while in custody at the Sangamon County Jail, he became better versed with it by going to the law library. Exh. HH at 8. Harvell also mentioned that, while in custody, he became acquainted with a fellow detainee who thought that Harvell's case sounded like it would be second-degree murder because Harvell was not the aggressor. Exh. HH Harvell at 9-10.

Harvell stated Noll would visit, "like every week," usually on Saturday or Sunday. Harvell would discuss his second-degree findings, but Noll responded that, "He had it already prepared, and I guess he didn't believe that what I was talking about was legitimate or not." Exh. HH at 10.

Harvell testified that he had concerns with Noll's defense strategy; that there were three witnesses who testified they saw Harvell with a revolver and Wig-man with an automatic; and that Harvell felt it did not make sense to go with an "all or nothing" strategy, because Harvell felt he would be found guilty. Exh. HH at 11. Harvell stated that Noll responded that he already had a strategy in place and not to distract him "with too many different things" and that it was too late to change trial strategies. Exh. HH at 11-12.

According to Harvell, Elizabeth met with Noll after Harvell voiced his concerns to Elizabeth. Exh. HH at 12.  He said Elizabeth told Harvell that Noll said the same things to her:  that he had a trial strategy in place, it was too late to change strategy, and he did not want to get distracted by other things. Exh. HH at 12.

Harvell acknowledged that the trial court asked him at the instruction conference whether Harvell understood the significance of a second-degree instruction and whether he understood that no one was tendering such an instruction, and that he responded yes to both inquiries. Harvell testified that he said yes because, "I understood that as far as my lawyer not tendering the Second

Degree instruction and State not tendering it that I can be found guilty of First Degree Murder." Exh HH at 13. Harvell said that at that time, he did not know he had the right to request a second-degree instruction. He also said that Noll never explained this right to him. Exh. HH at 14.

Harvell said that, at the 2004 remand, Noll "gave the impression, tried to say he is the one that wanted a Second Degree instruction but I didn't want one." Exh. HH at 115. Harvell disputed Noll's statement. Harvell said he had asked Noll "a few times" before trial for a second-degree instruction. Noll's trial strategy was built on the proposition that Harvell was not responsible, Wig-man was responsible, and it was possible that Wig-man had two guns. Exh. HH at 16. However, Harvell testified that he wanted to pursue a second-degree murder theory that if he was the perpetrator, he acted in response to Wig-man's provocation. Exh. HH at 16. Harvell testified that his affidavit, discussed above, was accurate. Exh. HH at 18.

Elizabeth then testified. She stated that throughout the case, she talked with Noll about two times, both times over the telephone. Exh. HH at 32, 38. Elizabeth stated she first heard about second-

degree murder from Noll before the start of trial, and that he would try to get Harvell's charges reduced to second-degree murder. Exh. HH at 33. She said she only spoke to Noll once about reducing the charge to second-degree.  Exh. HH at 34.

Elizabeth testified that Harvell did not tell her that he had any concerns about Noll.  Harvell told her he was concerned about the case and the charges. Exh. HH at 34. Elizabeth said she shared Harvell's concerns with Noll, and Noll responded by saying not to worry.  Exh. HH at 34.  Ms. Harvell affirmed the affidavit was an accurate representation of what occurred. Exh. HH at 35-37.

Attorney Noll testified that he has been consistently practicing law since 1975. Exh. HH at 39-40. Noll stated that during the 30 plus years of private practice his focus has primarily consisted of criminal defense. Exh. HH at 40. Of the 300 jury trials, Noll said that he had on occasion changed trial strategy during trial. Exh. HH at 40. Noll also testified that there have been occasions where he requested a lesser-included offense. Exh. HH at 41. Noll stated that he "generally" talked trial strategy with clients, such as "offer times, lesser-included offenses, possible admit certain elements that would not be admitted on the case in chief."  He said he wanted to get

approval from his clients for such matters.  He said, "Ultimately it is

. . . the client's decision as to whether or not to give a lesser

included charge." Exh. HH at 42.

Noll testified that he remembered discussing with Harvell the

possibility of pursuing a second-degree murder strategy due to

provocation. Exh. HH at 43-44. He said that Harvell was reluctant

to testify, and a second-degree charge would have probably required

Harvell to testify. Exh. HH at 46.  Noll said he discussed the

significance of the second-degree murder instruction:

> I explained to him essentially that you have to admit
> every element of the offense, that it was a reckless act,
> high probability of somebody being killed when you start
> firing a gun, and he understood that; and we talked
> about Second Degree, and his position was basically that
> he didn't think that they had a good strong case against
> him.

Exh. HH at 46.  Noll said that Harvell felt that the State did not

have a strong case against him because the State had videos of

Brandon Court, and Harvell did not appear on the videos:

> [M]arkus wasn't on the video tapes.  There was a young
> kid riding a bicycle at midnight, or whenever it was,
> around Brandon, so his position was that he did not
> believe the State's case was strong enough to convict him
> of First Degree Murder.

Exh. HH at 46.

Noll did not recall Harvell wanting to switch strategies at any point during the trial:

> We had discussions throughout the trial, and I cannot remember specifically him coming to me and saying they have a good case or I am going to be convicted, lets' try for Second Degree. There was nothing along those lines.

Exh. HH. 46-47. Noll said that he wanted to tender a second-degree murder jury instruction at the close of evidence. The Assistant State's Attorney at the hearing asked if Harvell opposed tendering a second-degree instruction:

> Q:     And did he oppose tendering the Second Degree instruction?
>
> A:     We didn't have a discussion like I am talking now where I sat down and said you have First Degree or Second Degree. It was do you want us to go forward with what we're doing? Do you want that strategy, and basically he didn't object to it.
>
> . . . .
>
> Q.     So again, were you in favor of tendering a Second Degree instruction and Markus said no?
>
> A:     He didn't say no. He just didn't object. He didn't come out and say, I want the Second Degree. I said, are you satisfied with this, is there anything else you want to present, any other issues? And basically, he said no, let's see what[] the Jury says. But it wasn't a situation where we [] were argumentative in any degree. Markus wasn't that way. He wasn't pounding on the table saying I want

Second Degree. If he had, I guarantee you I would have tendered that to the Judge.

Exh. HH at 48-49.  Noll stated that the first time he heard Harvell request a second-degree murder charge was in court during remand in May of 2004.

> Q:    Was that the first time you had heard him say he wanted Second Degree instructions [May 2004]?
>
> A:    Yes.
>
>        . . . .
>
> Q:    And did you answer that, you said, that got into a bit of conflict between me and my client. I had requested it. My client didn't want to proceed forward with it. Is that your recollection?
>
> A:    I believe that is my testimony then, and, quite frankly, that is my testimony today.

Exh. HH at 49-50. Noll stated:

> A:    Well, the decision itself, if you will, was joint between my client and myself. If he had wanted that I would have done it. He didn't want it, so I didn't do it. So I guess, if you will, the decision on any lesser included, to do it – and let me tell you, the lesser included sometimes upsets a Defendant. They upset them because in this case, for instance, he would have admitted every element, that he actually did the murder, but that he was provoked or some other mitigating factor. His position – Mr. Harvell's position, was they can't prove I shot that young man, period, so ultimately it was his decision to not tender it, if you will.

Exh. HH at 49-50.

During cross-examination, Noll stated the trial strategy was set up on the idea that Harvell did not commit the murder and it was, "[o]ur position at the beginning of the trial that [Harvell] did not commit this murder . . . ." Exh. HH at 51. Noll was asked again if there were any pre-trial discussions regarding second-degree murder, and Noll responded, "I am pretty sure there were. I can't tell you exactly the dates . . . . Mr. Harvell, who is a good, honest person, he went out to [Brandon] Court and didn't ask for any of this. . . . I felt that there could be some Jury nullification, some Jury consideration that he didn't go there to murder this young [] boy." Exh. HH at 52. Upon asking for further clarification on what Noll meant, Noll responded, "I say Jury consideration that there are mitigating factors that could have allowed for Second Degree consideration." Exh. HH at 53.

Noll also testified that he did not recall ever speaking with Elizabeth, but he also did not deny that it was possible he did. Exh. HH at 59.

Harvell's post-conviction appointed counsel asked Noll about his advice to Harvell that Harvell needed to testify if he wanted to pursue a second-degree murder instruction:

> Q:    Now, Mr. Noll, isn't it true that the only requirement to seek a Second Degree instruction on a provocation theory . . . there has to be some scintilla of evidence that was presented to the trier of fact that would support proceeding on such a theory correct?
>
> A:    That's correct statement of the law.
>
> Q:    [I]sn't it true, Mr. Noll, that there was a witness . . . named John Williams, who also appeared in the discovery who stated that he had been directly beside the victim when the victim was shot and that mere seconds passed between the shots being fired at the Defendant and the shots that were then fired by the Defendant? Dou you recall that?
>
> A:    [N]o I don't, but it should be in the record.
>
> Q:    Okay now, if John Williams were to so testify at trial, do you think that that would have been evidence that would have entitled Mr. Harvell to the benefit of Second Degree defense without his testimony?
>
> A:    Well, that is always difficult to say because there's other testimony, I believe, that said there were actually minutes between the first intent with the wig man and the actual death of the boy. There was other evidence is my point. . . .

Exh. HH at 61-62. Noll said that due to the inconsistencies in the testimony, he was "pushing for the Second Degree instruction with my client."  Exh. HH at 63.

At the conclusion of the evidence, the trial court denied the Post-Conviction Petition on the record from the bench.  Exh. HH 85-87.  The trial court said this case arose out of a "he said-he said situation with a couple of quirks."  Harvell said he wanted a second-degree murder instruction and Noll said Harvell did not want a second-degree murder instruction.

The trial court said that she believed Noll was certain of his testimony.  The trial court noted that Attorney Noll used phrases such as "I believe" Harvell said he did not want the instruction.  The Trial Judge said that in her experience with Noll over the past twenty years, the Judge understood Noll's manner of speaking, "He is the type that uses those types of words, he is a very proper speaker, very old fashioned speaker, and I don't believe that in the statements where he says, Your Honor, I believe this, he's indicating any self doubt of the situation." Exh. HH at 86.

The trial court found inconsistencies between Harvell's testimony and Elizabeth's testimony.  Harvell testified that he told

Elizabeth that Noll did not want to ask for the second-degree murder instruction. Elizabeth, however, testified that "she first heard about Second Degree from Mr. Noll, that he said he was going to see about getting a Second Degree charge or instruction given." The trial court further noted that Elizabeth said she only spoke to Noll "maybe twice." Exh. HH at 86.

The trial court said that, if Harvell was so concerned about Noll refusing to follow his request to give a second-degree instruction, he "would have made it clear to her what his concerns were." The trial court continued, "She was not clear at all in her testimony. Basically she testified to the opposite, that Mr. Noll was the one who talked about the Second Degree instruction and Second Degree would be the best way." Exh. HH at 87. The trial court stated that the inconsistency "doesn't bode well for Mr. Harvell's assertion here today that Mr. Noll was not listening to him." Exh. HH at 87.

The trial court also noted that she asked whether either party wanted to give a second-degree murder instruction, but her question was not answered. The trial court said, "It was 10 years ago. The Court does not remember what logistics were and how

that happened or why that happened, but I am going to deny the motion, and I assume that this will be appealed . . . ." Exh. HH at 87.

Harvell appealed. Harvell asserted the following issue on appeal:

> Whether the circuit court committed manifest error in denying the petition for post-conviction relief where the evidence presented during the evidentiary hearing established that trial counsel failed to inform petitioner that petitioner had the final decision regarding requesting second-degree murder instructions, failed to request those instructions, and, therefore, provided ineffective assistance of counsel?

Exh. J at 2.

On October 22, 2012, the appellate court affirmed the trial court's decision. Exh. M. The appellate court rehearsed in detail the evidence from the trial, post-trial hearing on remand, the affidavits accompanying the Post-Conviction Petition, and the testimony at the post-conviction hearing. Exh. M at 2-13. The appellate court stated that to establish ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984), Harvell had to show "(1) his counsel's representation fell below an objective standard of reasonableness, and (2) absent the

error, there is a reasonable probability that the trial's outcome would have been different." (internal quotation marks omitted). The appellate court stated that Harvell had to prove both elements. Exh. M at 14-15 ¶ 56.

The appellate court stated that Harvell claimed "on postconviction review" that "he was denied the effective assistance of counsel because his trial counsel denied him his right to choose whether to seek second-degree-murder jury instruction." Exh. M at 14 ¶ 56. The appellate court agreed with Harvell that under Illinois law at the time, he had the right to decide whether to request the second-degree murder jury instruction. The appellate court, however, upheld the trial court's finding that "defendant failed to prove defense counsel Noll took that decision from him." Exh. M at 16 ¶ 60:

> We find no manifest error in the court's decision. The trial court, upon observing the case presented the situation of "he said, he said," deemed the testimony of defendant and his mother was crucial in finding defendant had not established his claim. The court found convincing the testimony, from both defendant and his mother, that established Noll believed, in the beginning, the case was a second-degree-murder case. Noll testified he knew the decision belonged to defendant, the two worked on the strategy together, and defendant did not want to admit the elements of the offense or to testify.

> Noll also testified he discussed second-degree murder as a defense and defendant did not want to pursue it. The court believed Noll and, by dismissing the case, found defendant had not met his burden of making "a substantial showing of a deprivation of constitutional rights."

Exh. M at 16 ¶ 61 (quoting <u>People v. Coleman</u>, 206 Ill. 2d 261, 277, 794 N.E.2d 275, 286 (2002)).

The appellate court acknowledged "apparent inconsistencies" in Noll's testimony, but noted that, "The trial court was not convinced such inconsistencies showed defendant suffered a deprivation of constitutional rights." The appellate court held that the trial court's determination was not reversible error. Exh. M at 16-17 ¶ 62.

Harvell filed a PLA to the Illinois Supreme Court. Harvell alleged the following issues in his PLA:

> This Court should grant review to establish whether, in accord with *People v. Brocksmith's* holding that the decision to seek instruction on a lesser offense, such as second degree murder, is a personal right of the defendant and an attorney's violation of that right is ineffective assistance of counsel *(People v. Brocksmith,* 162 Ill. 2d 224, 229-30 (1994)), an attorney also provides ineffective assistance by failing to inform his client that the decision to seek a lesser offense instruction is the defendant's personal right when the evidence supports the instruction but the defendant, ignorant of his right to choose, follows the attorney's advice, does not seek the

lesser offense instruction, and is convicted of the more serious offense.

Exh. N at 2. On January 30, 2013, the Illinois Supreme Court denied Harvell's petition. Exh. O.

On October 3, 2013, Harvell filed this Petition. Harvell asserted the following grounds for the Petition:

> Ground One: Petitioner was denied the 6th and 14th Amendment Right to the effective assistance of counsel pursuant to Strickland v. Washington where (1) counsel failed to inform petitioner that petitioner had the final decision regarding requesting second-degree murder instructions, and (2) counsel failed to request second-degree murder instruction.

> Ground Two: Petitioner was denied 6th and 14th Amendments right to the effective assistance of counsel pursuant to Strickland v. Washington where counsel failed to perfect direct appeal by filing a written motion to reconsider 50 year sentence.

Petition, at 6-7.

This Court also allowed Harvell to supplement the Petition to assert the following additional ground:

> Supplemental Ground: Petitioner was actually innocent of the crime, and the ineffectiveness of his counsel resulted a miscarriage of justice.

Petitioner's Motion to Expand the Facts of his Legal Innocence Claim (d/e 15); Text Order entered September 23, 2014; see

Petitioner's Reply to Respondent's Supplemental Answer (20), at 2;
Motion for Leave to Supplement New Evidence (d/e 25); Text Order
entered February 18, 2016.

## II. **ANALYSIS**

Harvell seeks relief under 28 U.S.C. § 2254. Before a federal
court may review a claim raised by Harvell's Petition, Harvell must
exhaust his state court remedies. He had to present each claim in
the Petition to the Illinois appellate and Illinois Supreme Courts
(collectively the state courts) for a complete round of review on
direct appeal or in post-conviction proceedings. Malone v. Walls,
538 F.3d 744, 753 (7th Cir. 2008). Harvell had to present both the
operative facts and controlling legal principles underlying each of
the federal claims at issue. Id. (citing Williams v. Washington, 59
F.3d 673, 677 (7th Cir. 1995)).

If Harvell failed to adequately present any of his grounds for
relief to the state courts, this Court may only review such grounds if
Harvell demonstrates: (1) a cause for the failure and prejudice
because of losing review on the merits or (2) that lack of review
would result in a fundamental miscarriage of justice. Smith v.
McKee, 598 F.3d 374, 382 (7th Cir. 2010). Cause means an

objective factor, external to the defense, which prevented Harvell from adequately presenting the claim to the state courts for discretionary review.  Id.  Prejudice means an error that so infected the trial that his conviction violated due process.  Id.  A fundamental miscarriage of justice occurs only in the extraordinary case that includes evidence demonstrating innocence of the convicted petitioner.  See Sawyer v. Whitley, 505 U.S. 333, 339 (1992).

Moreover, even if Harvell adequately presented his claims to the state courts, the state courts' decision receives substantial deference under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996.  The AEDPA states that this Court may not grant habeas relief unless the state court's decision was contrary to federal law; involved an unreasonable application of clearly established federal law as determined by the Supreme Court; or was based on an unreasonable determination of the facts in light of the evidence.  See 28 U.S.C. § 2254(d)(1), (2).

Meeting the AEDPA standard for relief is difficult:

> Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief

for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement."

Burt v. Titlow, 571 U.S. 12, 19-20 (2013) (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)).

Under the AEDPA Harvell "bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" Burt, 571 U.S. at 12 (citing 28 U.S.C. § 2254(e)(1)); accord Taylor v. Grounds, 721 F.3d 809, 821 (7th Cir. 2013). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." Burt, 571 U.S. at 18 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).

Harvell presented Grounds One and Two to the state courts. Harvell raised on direct appeal to both the appellate court and the Illinois Supreme Court that Attorney Noll failed to file a written motion to reconsider Harvell's sentence. Harvell raised in his post-conviction petition to both the appellate court and the Illinois Supreme Court that Noll provided ineffective assistance of counsel

by failing to explain to him that he had a right to decide whether to request a second-degree murder jury instruction and by failing to request a second-degree murder instruction. The Court, therefore, may address the issues raised by Grounds One and Two on the merits.

Harvell failed to present the Supplemental Ground to the appellate court and the Illinois Supreme Court. Harvell cannot proceed on these grounds unless he can establish cause and prejudice or that a lack of review would result in a fundamental miscarriage of justice. Smith v. McKee, 598 F.3d at 382.

<u>GROUND ONE</u>

Harvell asserts in Ground One that Attorney Noll provided ineffective assistance of counsel because he did not explain to Harvell that he had the right to decide whether to offer the second-degree murder jury instruction and because Attorney Noll failed to offer the second-degree murder jury instruction. In evaluating habeas claims on the merits, this Court examines "the decision of the last state court to decide the prisoner's federal claim . . . on the merits in a reasoned decision." Wilson v. Sellers, __ U.S. __, 138 S.Ct. 1188, 1192 (2018). In this case, the Court looks to Exhibit M,

the appellate court's October 22, 2012 decision on Harvell's post-conviction petition appeal. <u>Wilson</u>, 138 S.Ct. at 1192.

The Court sees no basis for relief under Ground One. The appellate court accurately followed the constitutional standard for ineffective assistance of counsel set forth in the Supreme Court decision of <u>Strickland v. Washington</u>. 28 U.S.C. § 2254(d)(1). Exh. M. at 14-15 ¶ 56. The appellate court accurately said that Harvell had to prove, "(1) his counsel's representation fell below an objective standard of reasonableness, and (2) absent the error, there is a reasonable probability that the trial's outcome would have been different." (internal quotation marks omitted). Exh. M at 14-15 ¶ 56. The appellate court also correctly stated that Harvell had to prove both elements. <u>Id.</u>

The appellate court also agreed that under Illinois law Harvell had the right to decide whether to offer an instruction on second-degree murder. The appellate court explained second-degree murder is a lesser-mitigated defense in Illinois. A defendant must prove by preponderance that, although he committed the crime, a mitigating factor existed. If a defendant meets this burden of proof, he is found guilty, but the offense is mitigated to second-degree

murder and the penalties are not as harsh.  The appellate court

stated that deciding to pursue a second-degree murder defense is

analogous to deciding to enter a guilty plea.  As such, the appellate

court found that Harvell had the right to decide whether to offer the

instruction for second-degree murder.  The appellate court found

that Noll had to let Harvell decide whether to offer an instruction on

second-degree murder in order to meet the "objective standard of

reasonableness" under <u>Strickland</u>. Exh M at 15-16 ¶¶ 57-59.  The

Court sees no error in this portion of the appellate court's decision.[2]

The appellate court found under the facts that the trial court

properly found that Noll met this objective standard of

reasonableness.  The appellate court did not make an unreasonable

determination of these facts in light of the evidence.  28 U.S.C. §

2254(d)(2).  The appellate court noted that the trial court described

the evidence as a "he said-he said" situation.  The appellate court

---

[2] The Respondent notes that the Constitution does not require that the
defendant must make the decision whether to offer an instruction on a lesser-
included or lesser-mitigated defense.  <u>See</u> <u>Adams v. Bertrand</u>, 453 F.3d 428,
435-36 (7th Cir. 2006).  The issue here, however, is whether Attorney Noll met
the objective standard of reasonableness in his representation of Harvell.  For
purposes of this Opinion under these circumstances, the Court presumes that
an attorney meeting such a standard would meet the requirements of
applicable state law.

said that Noll's testimony supported a finding that Attorney Noll recommended requesting an instruction on second-degree murder and explained to Harvell that second-degree murder meant Harvell committed the crime, but he was less culpable because Wig-man provoked him to shoot. The appellate court said that Noll's testimony supported a finding that Harvell decided not to offer a second-degree murder instruction because he did not want to admit all of the elements and because he did not want to testify. Exh. M at 16 ¶ 61.

Harvell fails to establish by clear and convincing evidence that the appellate court erred in upholding the trial court's factual findings. <u>Burt</u>, 571 U.S. at 16. Harvell essentially asks the Court to believe him and his mother, Elizabeth, instead of Noll. Noll and Harvell gave conflicting accounts of their discussions regarding pursuing an instruction on second-degree murder. Harvell presents no clear and convincing evidence, and the Court sees no clear and convincing evidence, that the appellate court should have believed his account over Noll's. Absent such evidence, this Court cannot find "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error .

. . beyond any possibility for fairminded disagreement." <u>Burt</u>, 571 U.S. at 20.  The Court denies Ground One of Harvell's petition.

<u>GROUND TWO</u>

Harvell asserts in Ground Two that Noll failed to provide adequate assistance of counsel because he did not file a written motion to reconsider his sentence and thereby precluded Harvell from challenging his sentence on appeal.  The appellate court rejected this argument on appeal because Harvell made no showing that he was prejudiced by Noll's failure.  Exh. I, at 8-9.  The appellate court accurately stated and applied the federal constitutional standard for effective assistance of counsel in <u>Strickland</u> when the appellate court required Harvell to demonstrate prejudice.

Harvell argues that the appellate court erred because prejudice is presumed when an attorney fails to preserve an issue for appeal.  Harvell is incorrect. Prejudice is presumed if, under appropriate circumstances, an attorney precludes a defendant from filing an appeal at all.  Prejudice must be proven if the defendant retained the right to appeal, but an attorney failed to preserve a particular issue for appeal.  <u>Kitchen v. United States</u>, 227 F.3d

1014, 1021 (7th Cir. 2000). Harvell had the right to appeal and did so. See Exh. I. He only showed that Noll did not preserve his right to appeal the sentence. The appellate court properly determined that Harvell had to demonstrate prejudice and failed to do so. Harvell is not entitled to relief on Ground Two.

SUPPLEMENTAL GROUND

Harvell last asserts that Petitioner was actually innocent of the crime and the ineffectiveness of his counsel resulted in a miscarriage of justice. He argues that the trial evidence showed that Wig-man fired at Harvell and he immediately returned fire, essentially in self-defense. Harvell claims that he is actually innocent because Wig-man is guilty of the murder because he committed a felony when he fired his weapon and the death resulted from his actions.

A claim of actual innocence and a miscarriage of justice is a gateway to assert a specific constitutional violation. Such claims "have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400 (1993); see Milone v. Camp, 22 F.3d 693, 699 (7th Cir.

1994).  Harvell states that Attorney Noll was ineffective because he was actually innocent, but he does not identify Attorney Noll's constitutionally ineffective assistance or how the ineffective assistance caused the miscarriage of justice.  Harvell, therefore, fails to state a claim for habeas relief in the Supplemental Ground.

Moreover, Harvell also fails to establish that a miscarriage of justice occurred.  "The miscarriage of justice exception . . . applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" McQuiggin v. Perkins, 569 U.S. 383, 386 (2013) (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).

Harvell presents no new evidence.  He relies on the testimony that he returned fire within a few seconds after Wig-man shot at him.  Several witnesses, however, testified that two or more minutes passed after Wig-man fired before they heard additional shots.  The prosecution argued from this evidence that Harvell did not return fire in self-defense or provocation; rather, he retrieved his weapon from the car and went after Wig-man intent on revenge and retribution.  The jury heard the evidence, believed the prosecution's version of the events, and convicted him.  The evidence presented at

trial, therefore, does not establish that no reasonable juror would have convicted him. Harvell needs some new evidence to establish his innocence. He has presented none.

Harvell cites a District Court case that holds that new evidence is not necessary to establish a miscarriage of justice. Brumley v. Godinez, 1995 WL 382492 (N.D. Ill. June 26, 1995). The decision has no persuasive authority because the Seventh Circuit reversed it. Brumley v. DeTella, 83 F.3d 856 (7th Cir. 1996). Moreover, the Brumley District Court decision was decided before the Supreme Court reaffirmed in McQuiggin that a petitioner must present new evidence to establish a miscarriage of justice. McQuiggin, 569 U.S. at 386. Harvell presents no new evidence.

Finally, Harvell is not actually innocent even if Wig-man may have been culpable for the death under a theory of felony murder. The person who actually killed a victim may also be culpable for the crime even if a second person is culpable under a theory of felony murder. See e.g., Edmund v. Florida, 458 U.S. 782, 784-86 (1982). In Edmund, one defendant was guilty of felony murder while two other defendants who actually killed the victims were guilty of

murder.  Id.[3]   So it is here.  Harvell could still be guilty of murder

because he shot the victim even if Wig-man was guilty of the same

death under a felony-murder theory.  Wig-man's culpability does

not absolve Harvell from criminal responsibility for his acts.  Even if

the Court considered Harvell's Supplemental Ground on the merits,

he was not actually innocent, and so, did not suffer a miscarriage of

justice.  Harvell is not entitled to relief on the Supplemental

Ground.  Harvell's Petition, therefore, is DENIED.

## III. <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Rule 11(a) of the Rules Governing § 2254

Proceedings, this Court declines to issue a certificate of

appealability in this case.  To receive a certificate of appealability on

a ground that this Court ruled on the merits, "[t]he petitioner must

demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong."

<u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  "When the district

court denies a habeas petition on procedural grounds without

reaching the prisoner's underlying constitutional claim," a

---

[3] The <u>Edmund</u> decision addressed whether the person guilty of felony murder could receive the death penalty.  The <u>Edmund</u> decision did not challenge the fact that multiple actors could be culpable for the same homicide.

certificate of appealability should issue only when the prisoner shows both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484; see also Jimenez v. Quarterman, 555 U.S. 113, 118 n.3 (2009). This Court concludes that jurists of reason would not find Harvell's claims debatable and would not find this Court's procedural rulings debatable. Harvell fails to meet the requirements of the AEDPA for relief in Grounds One and Two, and he fails to establish a miscarriage of justice in his Supplemental Ground.

## IV. CONCLUSION

For the reasons stated, Petitioner Markus Harvell's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (d/e 2) is DENIED. The Court declines to issue a Certificate of Appealability. This case is CLOSED.

ENTER: September 28, 2018

/s/ Sue E Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE